AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

United States of America,

      Plaintiff,

    v.

ADAM IZA,
    also known as "Ahmed Faiq" and
    "The Godfather,"

      Defendant,

**LODGED**
CLERK, U.S. DISTRICT COURT

SEP 23 2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___rsm___ DEPUTY

Case No. **2:24-mj-05809-DUTY**

**FILED**
CLERK, U.S. DISTRICT COURT

09/23/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___GR___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

      I, the complainant in this case, state that the following is true to the best of my knowledge and belief. Beginning in or around 2018 and continuing to the present, in the County of Los Angeles in the Central District of California, the defendant violated:

| Code Sections | Offense Description |
|---|---|
| 18 U.S.C. § 241 | Conspiracy Against Rights |
| 26 U.S.C. § 7201 | Evasion of Tax Assessments |

    This criminal complaint is based on these facts:

    *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Barbara Johnson*
*Complainant's signature*

_____
Barbara Johnson, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 b_ tele_hone.

Date:    September 23, 2024        _____
                                  *Judge's signature*

City and state:   Los Angeles, California      Hon. Karen L. Stevenson, Chief U.S. Magistrate Judge
                                                      *Printed name and title*

AUSAs: Daniel J. O'Brien (2468) and Maxwell Coll (1785)

**AFFIDAVIT**

I, Special Agent Barbara Johnson, being duly sworn, declare and state as follows:

### I.    PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of a criminal complaint and arrest warrant against **ADAM IZA** ("**IZA**"), also known as "Ahmed Faiq" and "The Godfather," for conspiracy against rights, in violation of 18 U.S.C. § 241, and evasion of tax assessments, in violation of 26 U.S.C. § 7201.

2.  The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only and all dates are approximate.

### II.    BACKGROUND OF AGENT

3.  I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since March 2020.  I am currently assigned to a Public Corruption Squad, where I specialize in the investigation of corrupt public officials, including but not limited to bribery, extortion, and money laundering.  I have received training in the investigation of public corruption and associated white-collar crimes,

including bribery, fraud, money laundering, and financial crimes.  My training has also included the use of multiple investigative methods, and I am knowledgeable about the uses of electronic devices.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

4.    The FBI has been investigating **IZA** and Los Angeles Sheriff's Department ("LASD") deputies, known and unknown, for (1) extorting money and property from victims in Los Angeles and elsewhere; (2) the payments by **IZA** to LASD deputies in return for their commission of unlawful acts in their capacity as a law enforcement officers; (3) unlawful searches and arrests by LASD deputies in an effort to intimidate and silence victims; and (4) the evasion of tax assessments related to **IZA**'s receipt of tens of millions of dollars obtained through fraudulent means and the evasion of tax assessments by LASD deputies, including an LASD deputy referred to here as "LASD Deputy 1."

5.    As detailed in this affidavit, **IZA** accumulated significant wealth that he and his co-conspirators funneled through shell companies.  **IZA** spent the funds on personal expenses, including numerous luxury vehicles, rent payments for a Bel Air mansion, cosmetic surgery to extend the length of his legs, and numerous other luxury expenditures.  During the years 2020 through 2022, **IZA** concealed his receipt of tens of millions of dollars and did not report any income taxes.

IV.    <u>STATEMENT OF PROBABLE CAUSE</u>

6.    Based on records, witness interviews, my review of
electronic communications, and my knowledge of this
investigation, I know the following:

A.    <u>Extortion of Victim E.Z. and Execution of Unlawful Warrant</u>

7.    On or about June 3, 2022, the FBI became aware of a
letter written by an attorney representing a Victim E.Z.
requesting law enforcement assistance relating to an alleged
extortion and robbery committed by **IZA**.  The FBI also
interviewed a private investigator who worked for **IZA**.  The
private investigator corroborated the reported robbery of an
associate of Victim E.Z.  Further, the FBI reviewed text
messages that **IZA** sent showing that an LASD deputy unlawfully
obtained a warrant targeting Victim E.Z. as part of **IZA**'s
campaign of intimidation and harassment.

　　　　i.    *Law Enforcement Report Details Attempted Extortion*

8.    The FBI reviewed a Riverside County Sheriff Department
("RCSD") incident report dated November 21, 2021, detailing
allegations that Victim E.Z. was the target of an attempted
robbery and kidnapping by **IZA** and others.[1]  The report set forth
the following allegations:

　　　　a.    Victim E.Z. had known **IZA** for approximately two
years.  They were involved in business arrangements in the past.

---

[1] The RCSD incident report ultimately concluded that the
information provided by E.Z. was incomplete, that some of the
information did not make sense, and that there was insufficient
evidence to make an arrest.

Victim E.Z. and **IZA** recently discussed a business deal involving a medical service platform and cryptocurrency.[2]

b.    On November 21, 2021, Victim E.Z. was driving his car with **IZA** in the back seat.  **IZA** asked Victim E.Z. to stop at a gas station/store for food.

c.    After getting some food, while **IZA** and Victim E.Z. were standing near the rear of the car with the trunk door open, an SUV pulled up, and two white males exited.  The driver of the SUV approached Victim E.Z. with a black, semi-automatic handgun and told Victim E.Z. to "get in the car."  Victim E.Z. was able to run around the back of the store and call 911. Victim E.Z. acknowledged that he had a gun in the console of the car.

d.    Victim E.Z. believed that **IZA**'s attempt to kidnap him was for the purpose of gaining access to his digital assets from his phone.

e.    A responding RCSD deputy interviewed **IZA**, who claimed that Victim E.Z. had agreed to give **IZA** $300,000 in exchange for cryptocurrency.  **IZA** claimed that as they were driving, **IZA** became concerned as to where Victim E.Z. was going and **IZA** texted his bodyguards for help.  **IZA** claimed to have deleted the text message because he thought that Victim E.Z.

---

[2] Law enforcement databases reveal no known criminal history for Victim E.Z.  However, according to an FBI interview of the subject of a murder investigation conducted in 2019, who had a business relationship with **IZA**, Victim E.Z. allegedly was involved in a home invasion, kidnapping, theft, attempted extortion, and marriage fraud.

would see the text (even though **IZA** was in the back seat and Victim E.Z was driving on the freeway).[3]

      f.   The RCSD deputy interviewed the two individuals in the SUV, who were identified as a former LASD deputy and a former LASD custody assistant.

      g.   The former LASD deputy stated he owned a security company and had worked for **IZA** for approximately two weeks. He claimed that he was supposed to pick **IZA** up from a restaurant after a business meeting when he received a text message from **IZA** first saying, "follow me," and later asking for help and providing his GPS coordinates. He said that the sender of the message could delete the text from both the sending and receiving phone and **IZA** had done so. The former LASD deputy said that he responded to a gas station/store. As the former LASD deputy exited the SUV, he said he saw **IZA** and Victim E.Z. standing at the rear of the car. He claimed that he held his gun down by his side because **IZA** had told him that Victim E.Z. had a gun. The former LASD deputy told **IZA** to get in the car. Although Victim E.Z. did not have a gun, Victim E.Z. did have an electric screwdriver that could be used as a weapon. The former LASD deputy then attempted to disarm Victim E.Z., who ran behind the gas station/store. **IZA** and his associates collected two bags from the trunk of the car and then left in the SUV. They called 911 after **IZA** discovered that the bags were not his.

---

[3] According to an FBI interview of **IZA** in June 2022, Victim E.Z. stole a laptop that belonged to **IZA**, attempted to kidnap **IZA**, and was extorting **IZA** to provide the passwords for the stolen laptop.

9.    The letter written by Victim E.Z.'s attorney related the following information pertaining to subsequent events:

a.    On or around December 2, 2021, Victim E.Z. received text messages from an unknown number, which contained photos of Victim E.Z.'s CLETS report.[4]  One of the photos of the CLETS report displayed the top portion of a LASD business card. Victim E.Z. believed these messages were sent for the purpose of intimidation.

b.    On or around December 15, 2021, Victim E.Z. alleged that **IZA** and his bodyguards showed up at Victim E.Z.'s associate's residence looking for Victim E.Z.  Prior to this visit, the associate received a text message from a number previously used by **IZA** to communicate with E.Z.  The text message indicated that the sender knew Victim E.Z. was staying at the residence and threatened Victim E.Z., demanding that Victim E.Z. turn over his laptop with cryptocurrency to **IZA**.  A screenshot of this message was included in Victim E.Z.'s attorney letter:



_____

[4] CLETS is the California Law Enforcement Telecommunications System, a database containing personally identifiable information accessible only to law enforcement.

      c.   Victim E.Z. suffered other instances of harassment by **IZA** and his associates that included identity theft, stalking, impersonation, and phone number spoofing.  For example, Victim E.Z. received the below message with photographs of family members and his car, with the text "Everyone you know.":



          *ii.   **IZA** Private Investigator Corroborates Victim E.Z.*

   10.  Since September 6, 2022, the FBI conducted multiple interviews of K.C., a private investigator, who provided the following information:[5]

---

[5] K.C. and his attorney have provided the FBI with video and documentary evidence.  Much of that evidence was received from **IZA**'s counsel during the civil discovery process.  Some of that discovery included hyperlinks to videos stored on the cloud.  Those videos included screen-recordings of Telegram conversations between **IZA** and an individual M.I. during the
*(footnote cont'd on next page)*

a.    In November 2021, **IZA** hired K.C. to locate and surveil Victim E.Z.  **IZA** indicated to K.C. that Victim E.Z. was in possession of a laptop that Victim E.Z. had stolen from **IZA**. K.C. conducted surveillance and was in continuous communication with **IZA** and several of his associates.

b.    K.C. communicated with **IZA** via the encrypted communications application "Telegram" and through calls and text messages.  **IZA** sent photos of sensitive law enforcement data to K.C.  This data included multiple photos of a computer screen depicting DMV driver's license information not available to the general public and photographs of a computer screen depicting what appeared to be a GPS search warrant on a phone number believed to belong to Victim E.Z.

---

period November 2021 through March 2022, the same period in which **IZA** was tracking down E.Z. and his associate.  Given that the conversations contradicted **IZA**'s position in the civil matter and would harm his case, it is likely that **IZA**'s attorney did not realize the links were still functioning when he produced the discovery.

**IZA**'s attorney uploaded a bates-stamped email chain between **IZA** and two email addresses belonging to "Katy," which is the name of T.W.'s mother.  The emails discussed the dismissal of a civil lawsuit T.W. filed against **IZA**, Katy's attorney fees, that Katy would soon need to provide videos to the FBI, but that she hoped the content of those videos would not hurt **IZA**.  **IZA**'s responses to these emails were redacted.  The hyperlinks in the documents were still live and accessible.  To ensure proper authentication of Telegram messages which might have been planted by T.W. or M.I., the FBI is in the process of obtaining the evidence from the cloud server in New Zealand.

c.   **IZA** made statements in messages to K.C. indicating that **IZA** paid law enforcement officials to provide **IZA** with information on the location of E.Z.

d.   K.C. showed the FBI a text message thread between **IZA** and K.C.  On January 19, 2022, IZA sent a message to K.C. stating, "I found where [Victim E.Z.] staying" and then provided Victim E.Z.'s address.  After additional exchanges, K.C. asked **IZA**, "How's you guys find him Did this location come up on databases?" IZA responded, "Nop...We pinged his phone...For last 3 weeks...He had it off...Turned it off for 10 minutes...And turned back off."  K.C. responded, "Oh. Nice.  Usually that's a BS service."  **IZA** stated, "The ping was done by law enforcement themselves...It took a Warrant...And had to get signed by judge."  **IZA** then sent K.C. a photo which appeared to be of a screen showing a GPS ping warrant with Victim E.Z.'s phone number circled.

e.   On or about March 12, 2022, the brother of an LASD deputy referred to here LASD Deputy 2, allegedly robbed Victim E.Z.'s associate at the direction of **IZA** to steal a laptop.  K.C. was present during a meeting before the robbery, which included **IZA**, LASD Deputy 2, and his brother discussing the plans to, and implications of, robbing Victim E.Z.'s associate.

f.   On the date of the robbery, K.C. travelled to the residence and stayed outside in his car.  K.C. witnessed the associate come out of the building and saw LASD Deputy 2's brother seize the individual.  K.C. then became frightened and

drove away.  Later, he then circled back, picked up LASD Deputy
2's brother, and took him to **IZA**'s residence.

g.    K.C. provided a picture of a text message K.C.
received from a number known to be used by LASD Deputy 2's
brother.  The message dated March 12 shows the deputy's brother
informing K.C. that he is "perfectly hidden in front of truck,"
that they would "implement your plan for a few hours," and that
"from 12 to 4am is when I think he might move like he did."

h.    **IZA** paid K.C. via an American Express ("AMEX")
card belonging to **IZA** and wire transfers that originated from a
company Dream Agency, discussed below.

i.    In or around March 2022, **IZA** fired K.C.,
retracted payments made to K.C. through AMEX and wire transfers,
and refused to pay K.C. for services provided.[6]

      iii.    *FBI Reviews Unlawfully Obtained Warrant Targeting*
            *Victim E.Z.*

11.    In or about February 2023, the government obtained a
copy of a search warrant application and affidavit executed by
LASD Deputy 1 on January 6, 2022, for GPS location information
on several telephones, including one used by Victim E.Z.

12.    The allegations contained within the affidavit
pertained to a firearms case that had no relationship to Victim
E.Z. and Victim E.Z. was not identified as the user of any
telephone numbers, nor was Victim E.Z. referenced at all in the
affidavit.

---

[6] Financial records independently obtained by the government
show two wire transfers from Dream Agency to K.C.'s business
account, and that K.C.'s business account was frozen in
approximately April 2022 and closed in July 2022.

13.  Based upon my review of the affidavit, it appears that LASD Deputy 1 added Victim E.Z.'s phone number to a list of phone numbers associated with the firearms investigation and falsely stated that Victim E.Z.'s phone number had been used by the firearms suspect.  This sworn affidavit resulted in a warrant for GPS tracking information that identified Victim E.Z.'s residence.

14.  Based on Telegram messages between **IZA** and LASD Deputy 1 provided to the FBI in June 2024, LASD Deputy 1 sent screenshots to **IZA** of text messages between LASD Deputy 1 and a law enforcement crime analyst confirming that the GPS pings would be activated shortly.  LASD Deputy 1 followed this screenshot with a text stating the service provider "acknowledged the warrant and spoke to my crime analyst and said the pings will be up in 24 hours."  LASD Deputy 1 also sent a photo of an official law enforcement email from the service provider to LASD Deputy 1 and the aforementioned crime analyst, which appeared to be taken by a second phone, as the reflection on the screen showed a hand holding the phone taking the photo.

15.  The FBI also reviewed a photo depicting a computer screen showing a Superior Court of California, County of Los Angeles Search Warrant.  Located in the upper lefthand corner of the screen was "LASD," followed by a file number.  The photo was edited to draw a line over the name that would typically appear before the words "swears under oath that the facts expressed by him . . . ."  Further down on the warrant was an edited line circling the name of LASD Deputy 1, which directly followed the

words "having been this day made before me by Detective [LASD
Deputy 1]. . . ."

16.   In other messages received by the FBI, **IZA** sent
messages on January 6, 2022, stating:

a.   "damn my guy actually filed the warrant...that's
some serious shit to do for someone...risking 24 years career."

b.   "Warrant is complete.. I will get it signed in
the morning by the judge and email it to my crime analyst to
submit it to [service provider]." (**IZA** appears to have forwarded
this message from LASD Deputy 1).

c.   "I pay him 280k a month for complete resources."

d.   "they're all active duty," in an apparent
reference to law enforcement active-duty officers.

//
//
//

17.    In another message in the same chain, **IZA** sent a photograph with law enforcement officers and noted that the "one doing the warrant has federal authority":



18.    According to an LAPD police report filed by Victim E.Z., on March 30, 2022, three unknown armed suspects attempted a home invasion on Victim E.Z.'s residence.  As suspects forced the door open, Victim E.Z. shot twice in the direction of the suspects.  Following this incident, Victim E.Z. reported to LAPD that a person claiming to be **IZA** sent threatening messages, including a video of the attempted home invasion to Victim E.Z.

13

The video appeared to have been filmed by one of the three suspects.

> iv.  *FBI Reviews Photo of LASD Deputy 2 Laptop in*
> ***IZA**'s Residence*

19.  As discussed above, the FBI reviewed text messages that Victim E.Z. received that contained photos of CLETS reports for Victim E.Z.  The CLETS reports showed E.Z.'s personal identification information, including his address and vehicles that had been registered under his name.  One of the photos showed the top of a LASD business card just below the CLETS report.  Copies of these CLETS report photos were produced to the government by T.H., who is discussed below.

20.  The FBI also reviewed a photograph from the same time period of a laptop with LASD Deputy 2's name in the top-right corner appearing to look up vehicles.  Based on my review of body camera footage from inside **IZA**'s residence and my tour of the residence in April 2024, I believe the laptop in the photograph with LASD Deputy 2's name was taken inside **IZA**'s office at his Bel Air residence.

**B.  Extortion and Civil Rights Violations Against Victim R.C.**

21.  On or about April 29, 2022, I interviewed Victim R.C., who provided the following information:[7]

    a.  In the summer of 2021, Victim R.C., who works as an event planner, received an email from Zort, Inc. ("Zort"), a business owned by **IZA**, asking for his assistance with planning

---

[7] Based on the review of evidence in this case, I have an understanding that Victim R.C. has a history of drug use.

and organizing a large party for **IZA**'s 21st birthday.  A person named "Lewis" purported to be **IZA**'s aide and coordinated the details of the party with Victim R.C. via text from a phone hereinafter referred to as the "Lewis phone."

b.    In August 2021, Victim R.C. organized and held the event at **IZA**'s residence in the Bel Air area of Los Angeles, California.  At the party on August 14, 2021, **IZA** introduced Victim R.C. to individuals who appeared to act as **IZA**'s personal bodyguards.  For his services planning the party and the associated costs, **IZA** paid Victim R.C. approximately $50,000 a few days before the event.  Victim R.C.'s total net profit for the event would have been approximately $5,000 after incurring roughly $45,000 in expenses.

c.    Victim R.C. and his associate arrived at **IZA**'s residence together but were separated.  LASD deputies were present at the house.  Victim R.C. was taken to **IZA**'s home office where **IZA** was seen at his desk loading bullets into a firearm magazine.  A handgun described as "square and black" was on the desk and an AR-15 was propped up against the side of the desk.  Several officers and/or guards ("bodyguards") were present in the room.  Victim R.C. observed badges on their belts.

d.    **IZA** told Victim R.C. that he was displeased with the party and that Victim R.C. owed him a reimbursement of half the cost.  **IZA** demanded Victim R.C.'s phone, but Victim R.C. refused.  Victim R.C. then attempted to reach for his own pocket, causing the bodyguards to draw their firearms on Victim

15

R.C.  The bodyguards' firearms were pointed at Victim R.C. for the remainder of this incident.  Victim R.C. handed his phone to one of the bodyguards, who then attempted to use Victim R.C.'s face to unlock the phone.  The attempt was unsuccessful, and when asked by **IZA**, Victim R.C. then provided his password.  **IZA** proceeded to transfer $25,000 from Victim R.C.'s business bank account back to **IZA**'s account.[8]  During this incident, **IZA** photographed Victim R.C.'s driver's license, passport, and multiple credit cards.  **IZA** kept possession of Victim R.C.'s phone.  Following the initial theft of funds and the phone, Victim R.C. was allowed to leave **IZA**'s residence.

e.    In subsequent days, **IZA** made multiple money transfers from Victim R.C.'s accounts using Victim R.C.'s phone.[9]

f.    The following month, in or around September 2021, Victim R.C. was in a vehicle with a woman with whom he had a romantic relationship in the Lakewood area of Los Angeles.  An LASD deputy conducted a traffic stop on the vehicle.  An LASD deputy told Victim R.C. that he was being arrested on a bench warrant.[10]  After conducting a vehicle search, the LASD deputy

---

[8] Bank records from JPMorgan Chase Bank show that on August 13, 2021, Zort wired $50,000 to Victim R.C.'s business account and that on August 16, 2021, the business account wired $25,000 back to Zort.

[9] Bank records show that between August 16 and August 24, 2021, the Victim R.C. business account was further depleted through multiple smaller transactions totaling tens of thousands of dollars.

[10] Law enforcement databases indicate that Victim R.C. was arrested, detained, and/or cited for an assault with a deadly weapon, in violation of Cal. Penal Code § 245, on July 17, 2020, that a bench warrant was issued for Victim R.C.'s arrest on that matter on October 29, 2020, and that on October 21, 2021, Victim R.C. was granted 12 months' diversion.

found two bags in the vehicle.  The deputy then arrested Victim R.C. for possession of drugs.  The LASD deputy did not detain or arrest the woman, though she was the driver, it was her vehicle, and, according to Victim R.C., she was unable to provide any form of identification to the deputy.  Victim R.C. claimed to be unaware of the drugs until they were pulled over by the LASD deputy.

g.    During the arrest, Victim R.C. saw **IZA** drive up to the scene in a black SUV, exchange a few words with the deputy, look at Victim R.C., and drive off.  Victim R.C. was arrested and held in jail for three days.  Law enforcement databases show that Victim R.C. was arrested for the transportation of controlled substances and that the charges were dropped for lack of sufficient evidence.[11]

h.    Following the arrest, Victim R.C. received text messages from the Lewis phone with a photograph of Victim R.C.'s arrest in progress and **Victim** R.C.'s booking photo, which appeared grainy and with a visible cursor hovering over the image, as if someone took a photo of a computer screen.  The Lewis phone sent a message along with the photo stating, "Worthless loser" and "Congrats on the drug felony arrest." Victim R.C.'s text messages were synced to Victim R.C.'s computer, which preserved historical text messages:

---

[11] Law enforcement databases confirm that Victim R.C.'s September 27, 2021 arrest was dismissed for lack of sufficient evidence on January 9, 2022.



i.   Victim R.C. received a photo from the Lewis phone that depicted Victim R.C. in handcuffs while being escorted by a LASD deputy at the scene of the arrest.  The photo appeared to be taken through a car window, as the top of the picture was cut off, dark, and blurred.  Another text was sent from the Lewis phone after transmitting this picture stating, "For a drug dealer, you fucked with the wrong people."

j.   On or about October 12, 2021, LASD deputies executed a narcotics-related search warrant at Victim R.C.'s residence and on Victim R.C.'s person.  Victim R.C. arrived home and was met by LASD deputies.  Victim R.C. was handcuffed and

placed in the back of an unmarked LASD unit during the entirety of the search.  Victim R.C. claimed he was never shown the search warrant and was not left a copy.  Victim R.C. claimed that LASD deputies destroyed Victim R.C.'s apartment during the search and that no narcotics were located.[12]

22.   In or around November 2023, the government obtained the Los Angeles Superior Court warrant used to search Victim R.C.'s residence, including the sealed affidavit supporting the application.  In the sealed affidavit, the affiant stated that LASD Deputy 1 indicated that a confidential informant told him that Victim R.C. was selling narcotics and stored large quantities of fentanyl and cocaine at Victim R.C.'s residence. The affiant stated that LASD Deputy 1 showed the confidential informant a photograph of Victim R.C. and that the informant confirmed the person in the photograph was the person selling narcotics.  LASD Deputy 1 did not disclose his existing relationship with **IZA** or payments received from **IZA**, discussed below.

23.   On or around April 29, 2022, Victim R.C. provided the communications between the Lewis phone and Victim R.C. that were stored on his computer, including the photographs referenced above.[13]

---

[12] LASD records indicate that during the execution of the search warrant, a plastic baggy containing a white powdery substance resembling Ketamine was located on Victim R.C.'s person.

[13] In 2023, the government obtained a search warrant for Victim R.C.'s computer; the government did not execute the warrant because R.C. voluntarily provided it to investigators.

C.    **Robbery of Victim T.W. by Gunpoint and Continued Harassment**

24.    In or around November 2023, the FBI conducted an interview in the Philippines of two U.S. citizens currently incarcerated in that country charged with murder, including Victim T.W.  During the interview, Victim T.W. informed agents that **IZA** was harassing him, his family, and his friends to secure a password from him to access large amounts of cryptocurrency hosted on his laptop.

25.    According to Victim T.W., in 2018, Victim T.W. was the victim of a home invasion robbery allegedly committed by **IZA** and his then associate Victim E.Z.[14] in Los Angeles, in which **IZA** impersonated an FBI agent.  During this robbery, **IZA** stole the laptop containing the cryptocurrency, held Victim T.W. and Victim T.W.'s girlfriend at the time at gunpoint, and demanded the passwords for the laptop in order to access the cryptocurrency.

26.    In a separate June 2024 interview with a different witness, T.H., who is discussed below, told the FBI that **IZA** told him that **IZA** once pretended to be an FBI agent in 2018 and robbed individuals of a substantial amount of cryptocurrency.

D.    **Financial Tracing Shows IZA Payments to LASD Deputies**

27.    A review of financial records obtained by the government indicates that **IZA** and his girlfriend at the time ("Co-Conspirator 1") made substantial payments to law enforcement officers.  The following summary does not capture

---

[14] The Victim E.Z. referred to in this section is the same Victim E.Z. referenced in Section IV.A.

all relevant transactions but provides examples of the payments made.

28.   In text messages reviewed by the FBI, **IZA** bragged about his payment of funds to LASD deputies:



     *i.*    *Payments to LASD Deputy 1*

29.   During 2021 and 2022, LASD Deputy 1 and his business received approximately $154,933 and approximately $101,130, respectively, from Zort, Inc. – **IZA**'s business.  Between September 2021 and October 2021, Co-Conspirator 1 paid LASD Deputy 1's personal account approximately $22,000 from her personal accounts.  And between September 2021 and March 2022, a bank account for Dream Agency (discussed below) paid LASD Deputy 1's personal account approximately $198,149.[15]

30.   As an example of payments sent to LASD Deputy 1's personal account, between on or about January 12 and January 26, 2022, LASD Deputy 1's personal account received approximately five payments from Zort totaling $29,500.  Between on or about January 5 and January 12, 2022, Dream Agency made approximately three payments to LASD Deputy 1's personal account totaling

---

[15] In a deposition from July 25, 2023, Co-Conspirator 1 stated that she met all of **IZA**'s security people.  She stated she knew there were "anywhere from 10 to 15 on rotation every 12 hours."  Co-Conspirator 1 recalled specific first names.

approximately $16,222.

31.   As an example of payments sent to LASD Deputy 1's business account, on or about January 26, 2022, LASD Deputy 1's business account received a payment of approximately $6,875 from Zort.

### ii.  *Payments to LASD Deputy 3*

32.   Between September 2021 and December 2021, another LASD deputy ("LASD Deputy 3") received approximately $72,500 from **IZA** through corporate bank accounts and Co-Conspirator 1.  This amount was transferred in four separate transactions.  Financial records show that Zort transferred approximately $10,000 to a business account LASD Deputy 3 controls; Co-Conspirator 1 transferred approximately $22,500 to a business account LASD Deputy 3 controls; and Dream transferred approximately $40,000 to a business account LASD Deputy 3 controls.[16]

### iii. *Payments to LASD Deputy 2 and His Brother*

33.   During 2021 and 2022, accounts under LASD Deputy 1's control disbursed monetary payments to LASD deputies known and unknown.

34.   As discussed above, the FBI was informed of a robbery of Victim E.Z.'s associate involving LASD Deputy 2 and his brother.  Financial tracing also shows their receipt of funds

---

[16] In addition to the payments received, phone records show that between August 2021 and August 2022, **IZA** and LASD Deputy 3 contacted each other more than 140 times. Phone records also show that LASD Deputy 3 called Co-Conspirator 1 twice on September 7, 2021, and that Co-Conspirator 1 called LASD Deputy 3 on October 30, 2021.

from LASD Deputy 1.[17]

35.    With respect to LASD Deputy 2:  In 2021, 2022, and 2023, LASD Deputy 1 sent approximately $19,501 to LASD Deputy 2 in payments to his Chase Zelle account.  The funds were transferred into the account from both LASD Deputy 1's personal bank account and corporate bank account.

36.    With respect to LASD Deputy 2's brother:  In 2022 and 2023, LASD Deputy 1 sent approximately $11,350 to LASD Deputy 2's brother.  This includes approximately $7,376 sent to his Chase Zelle account.  The funds were transferred into the account from both LASD Deputy 1's personal bank account and corporate bank account.

## D.    IZA Obtains Millions of Dollars Through Fraudulent Means

37.    In addition to the conduct described above, based on my conversations with the Internal Revenue Services ("IRS"), **IZA** engaged in various schemes that led to the accumulation of significant wealth that was not reported to IRS.  This affidavit does not discuss the full extent of the schemes.

### i.    Opening of Shell Companies and Bank Accounts

38.    On or about January 30, 2020, **IZA** incorporated Zort in the State of Delaware.  The stated purpose of the company was an artificial intelligence-based cryptocurrency trading platform.  Zort was registered with the IRS as a C Corporation.  **IZA** opened and had signatory authority over Zort corporate bank accounts, including accounts at Bank of America ("BOA") and JPMorgan Chase

---

[17] In addition to financial transactions, phone records show incoming and outgoing calls between LASD Deputy 1 and LASD Deputy 2's brother in 2023 and 2024.

Bank ("Chase").  **IZA** and Co-Conspirator 1 (his girlfriend at the time) were the only signatories on the Zort bank accounts.

39.  On or about February 8, 2021, Co-Conspirator 1 incorporated Dream Agency ("Dream") in the State of California. The stated purpose of the company was a marketing agency.  Dream was registered with the IRS as an S Corporation.  Co-Conspirator 1 opened and had exclusive signatory authority over Dream corporate bank accounts, including accounts at BOA and Chase.

40.  On or about April 8, 2022, Co-Conspirator 1 incorporated Rise Agency, Inc. ("Rise") in the State of California.  The stated purpose of Rise was a marketing agency. **IZA** replaced Co-Conspirator 1 as the CEO and was added as an additional director of Rise on or about November 3, 2022.  Rise was registered with the IRS as an S Corporation.  Co-Conspirator 1 opened and had signatory authority over a Rise corporate bank account with Chase and IZA was added as a signatory shortly thereafter.  **IZA** and Co-Conspirator 1 were the only signatories on the Rise bank account.

41.  The corporate bank accounts for Zort, Dream, and Rise each received millions of dollars of potentially fraudulent proceeds from 2020 to 2022.  **IZA** spent millions from these bank accounts on personal expenses.

   ii.  *Facebook Advertising Fraud and Laundering*

42.  Based on my conversations with IRS agents, I understand that after analyzing Zort's BOA business bank account, it was determined that Zort received wire transfers and payments from various customers including companies and

24

individuals.  Interviews with these customers determined these payments to Zort were for Facebook advertisement account services.  **IZA**, acting under the online alias of "Diego," sold Facebook advertisement accounts and accounts with credit lines attached to them.  These accounts were used by customers to fund their various marketing campaigns on Facebook.

43.  According to IRS agents who conducted the interviews, customers stated they communicated with an individual, "Diego" (**IZA**), who messaged them on Telegram selling Facebook advertisement accounts.  **IZA** would then tell customers to send funds to his over-the-counter broker, Zort, and that Zort would send him cryptocurrency.  However, as discussed above, **IZA** was the business owner for Zort and had control over Zort's bank accounts.

44.  On or around August 2021, **IZA** started to tell customers to pay Dream for Facebook advertisement services.  Customers who paid Zort and Dream stated that **IZA** (using the name Diego or another alias) instructed them on where to send the money.  Analysis of Dream and Zort's bank activity show Dream transferred approximately $4,098,750 to Zort's bank accounts between October 2021 and July 2022.

45.  In or around 2022, **IZA**, messaging customers utilizing other aliases "Tony Brambilla" ("Tony") and "Leo," instructed customers to pay Rise for Facebook advertisement services.  In or around July 2022, Rise started to receive deposits like those Zort and Dream received for Facebook advertisement services.

46.  In addition to the IRS interviews of customers and

payors, the FBI conducted an interview in June 2024 of T.H.,[18] who worked with **IZA** in Los Angeles throughout 2020. According to T.H., in October 2020, the two entered into a very profitable scheme together that involved selling Facebook advertising space utilizing discount spending opportunities provided by one of T.H.'s associates in Serbia. **IZA** supported T.H. by allowing T.H. to use **IZA**'s bank accounts since T.H. did not have a social security number and could not establish his own corporation in the United States.

47. According to T.H, at various times, **IZA** and T.H. paid Facebook employees to unblock or "whitelist" advertisement accounts posting content that violated Facebook's advertising rules. **IZA** and T.H. illicitly purchased access to Facebook advertising accounts with up to, and sometimes exceeding, 2,500 advertising credit lines, and potentially manipulated accounts to clear debts owed to Facebook.

48. According to T.H., he began struggling mentally in January 2021, and **IZA** suggested that T.H. take some time to himself and helped him check into a rehabilitation clinic. After dropping T.H. off at the clinic, **IZA** took control of T.H.'s electronics, including his laptop. In what T.H. now views as a ploy to take control of his Facebook advertising business, **IZA** provided evidence to the FBI to have T.H. arrested on charges related to a business T.H. operated involving Shopify.com.

---

[18] T.H. is not a U.S. citizen, but is currently on probation for a 2021 federal wire fraud conviction.

49.  According to T.H., while T.H. was in federal custody, **IZA** continued to use T.H.'s laptop for **IZA**'s own personal business opportunities, including the takeover of T.H.'s Facebook advertising business.  T.H. used software on his laptop, known as "Gyazo," that made it easy to take and share screen captures of the computer screen.  T.H. used this software often as it allowed him to easily share what he was doing in online conversations, and to catalogue his activities.  Gyazo also automatically uploaded any screenshot taken to cloud storage, which T.H. could access using login information to which only he had access.

50.  **IZA** continued to use the Gyazo application to seemingly catalogue and share what he was doing.  When T.H. was released from custody, he discovered numerous new screenshots were uploaded into his cloud storage.  T.H. assumed from the nature of the content uploaded that **IZA** was unaware the Gyazo application automatically uploaded these images.

51.  T.H. advised the FBI that **IZA** had other images saved online that showed **IZA** had created his own methods for obtaining Facebook business manager accounts that involved a "phishing" scheme to steal account users login credentials.  **IZA** then proceeded to sell access to credit lines of these users of which he obtained unauthorized access, leading to substantial personal profit at the expense of both Facebook and/or associated businesses.

52.  Based on my conversations with IRS agents, I understand that as part of this Facebook advertising scheme, **IZA**

received at least $4,188,878 in unreported gross receipts in 2020; at least $12,954,729 in unreported gross receipts in 2021; and at least $402,740 in unreported gross receipts in 2022. Bank accounts controlled by **IZA** and Co-Conspirator 1 show another $10 million received from international payors during this same timeframe. After factoring in other deposits, the total amount of income to **IZA** and Co-Conspirator 1 for all three years was approximately $33 million.

**E.    IZA Evades Assessment of Taxes During 2020 Through 2022**

53.    Despite the accumulation of significant wealth, **IZA** did not report any income for the years 2020 through 2022. During those years, **IZA** took affirmative steps to evade the assessment of taxes, including the expenditure of millions of dollars on personal items and travel.[19]

*i.    Evasion of Assessment of Taxes for 2020*

54.    Based on my conversations with IRS, **IZA** attempted to evade the assessment of approximately $1,715,196 in federal taxes due and owing by him to the United States for the calendar year 2020. **IZA** failed to file a U.S. Income Tax Return (Form 1040) and a U.S. Corporate Income Tax Return (Form 1120) for the calendar year 2020. Despite not reporting taxes, **IZA** sent approximately $2,689,605 from Zort's BOA bank account to a U.S. cryptocurrency custodian. **IZA** also used Zort corporate bank accounts including through the use of direct payments, cashier's

---

[19] In 2021, a Form 1040 was filed under the name Ahmed Faiq (**IZA**'s former legal name) using **IZA**'s social security number. Based on my conversations with IRS, it is believed this Form 1040 was fraudulently filed by a third party.

checks, and credit cards, to pay for personal items and expenses of himself and Co-Conspirator 1.  This included the following transactions:

     a.   On or about October 8, 2020, **IZA** leased a 2018 Ferrari 488 Spyder in Zort's name and using funds from Zort's BOA bank account;

     b.   On or about December 7, 2020, **IZA** leased a 2019 Ferrari 488 Pista and a 2019 Lamborghini Aventador SVJ in Zort's name and, using funds from Zort's BOA bank account;

     c.   **IZA** and Co-Conspirator 1 spent at least approximately $72,558 in luxury goods using funds from Zort bank accounts; and

     d.   **IZA** and Co-Conspirator 1 spent at least approximately $38,175 in travel expenses using funds from Zort's BOA bank account.

### ii.  *Evasion of Assessment of Taxes for 2021*

55.  Based on my conversations with IRS, **IZA** attempted to evade the assessment of approximately $6,727,658 in federal taxes due and owing by him to the United States for the calendar year 2021.  **IZA** failed to file a U.S. Income Tax Return (Form 1040) and a U.S. Corporate Income Tax Return (Form 1120) for the calendar year 2021.  Despite not reporting taxes, **IZA** sent approximately $11,115,975 from Zort's BOA and Chase bank accounts to a Singapore-based investment firm for the purchase of cryptocurrency.  **IZA** also used Zort and Dream corporate bank accounts including through the use of direct payments, cashier's checks, and credit cards, to pay for personal items and expenses

of himself and Co-Conspirator 1.  This included the following transactions:

a.   **IZA** continued to lease the 2019 Ferrari 488 Pista and a 2019 Lamborghini Aventador SVJ in Zort's name and using funds from Zort's BOA bank account.

b.   On or about March 15, 2021, **IZA** leased a third car, a 2021 Lamborghini Aventador SVJ Roadster, in Zort's name and, using funds from Zort's BOA bank account.

c.   On or about June 30, 2021, **IZA** leased a residential property in the Bel Air area, with a monthly rent of approximately $200,000.  **IZA** spent approximately $1,640,007 from Zort's business accounts to pay for the security deposit and rent for this residential property.

d.   **IZA** spent approximately $280,000 for rent on a residential property in Newport Coast, California, using funds from Zort and Dream bank accounts.

e.   **IZA** and Co-Conspirator 1 withdrew approximately $770,000 in cash from Zort and Dream bank accounts, including $263,000 from Zort's BOA account, $120,000 from Zort's Chase account, and $387,000 from Dream's BOA account.

f.   **IZA** and Co-Conspirator 1 spent approximately $667,255 in luxury goods from Zort and Dream bank accounts.

g.   **IZA** and Co-Conspirator 1 spent approximately $260,468 in travel expenses using Zort and Dream bank accounts.

*iii.* *Evasion of Assessment of Taxes for 2022*

56.  Based on my conversations with IRS, **IZA** attempted to evade the assessment of approximately $3,636,278 in federal

taxes due and owing by him to the United States for the calendar year 2022. **IZA** failed to file a U.S. Income Tax Return (Form 1040) and a U.S. Corporate Income Tax Return (Form 1120) for the calendar year 2022. Despite not reporting taxes, **IZA** sent approximately $661,000 from Zort's Chase bank accounts to a Singapore-based investment firm for the purchase of cryptocurrency. **IZA** also used Zort, Dream, and Rise corporate bank accounts including through the use of direct payments, cashier's checks, and credit cards, to pay for personal items and expenses of himself and Co-Conspirator 1. This included the following transactions:

a. **IZA** (and potentially Co-Conspirator 1) continued to lease the 2021 Lamborghini Aventador SVJ using funds from Zort and Rise bank accounts.

b. On or about February 14, 2022, a 2022 Vanderhall Venice GT was purchased for approximately $42,078.33 using Zort's Chase bank account. The title of this vehicle was in Co-Conspirator 1's name.

c. On or about February 24, 2022, **IZA** leased a 2019 Rolls-Royce Phantom in Zort's name and using Zort's Chase bank account.

d. On or about September 27, 2022, **IZA** purchased a 2022 Mercedes Benz GLS600Z4, spending approximately $219,248 from the Rise Chase bank account.

e. On or about September 27, 2022, **IZA** purchased a 2018 Mercedes Benz GTCA, spending approximately $62,807.86 from Rise's Chase bank account. The title was in both **IZA** and Co-

Conspirator 1's names.

        f.   **IZA** spent approximately $820,621.36 from Zort's Chase account for rent payments toward the residential property in the Bel Air area.

        g.   **IZA** spent approximately $282,400 for rent on a residential property in Newport Coast, using funds from Zort, Dream, and Rise bank accounts.

        h.   **IZA** and Co-Conspirator 1 withdrew approximately $538,427 in cash from Zort, Dream, and Rise bank accounts, including approximately $158,000 from Zort's Chase account, approximately $21,000 from Dream's BOA account, approximately $244,703 from Dream's Chase account, and approximately $113,924 from Rise's Chase account.

        i.   **IZA** and Co-Conspirator 1 spent approximately $393,578 in luxury goods from Zort, Dream, and Rise bank accounts.

        j.   **IZA** and Co-Conspirator 1 spent approximately $650,532 in travel expenses using Zort, Dream, and Rise bank accounts, including approximately $159,831 at the Wynn Las Vegas.

        k.   **IZA** spent approximately $64,000 on surgery to increase his height using funds from the Rise Chase bank account.

**F.   IZA Moves to Dubai and Briefly Returns to the United States**

     57.  On or about March 28, 2023, **IZA** left the United States and travelled to the United Arab Emirates and did not return to the United States until on or about July 3, 2024.

58.  Based on my review of messages, **IZA** indicated he did not intend to stay in the United States long-term.  On or about November 30, 2021, **IZA** stated that his goal was to move to Monaco.  In a message exchange in which **IZA** acknowledged his exposure to the IRS, **IZA** stated that "[. . .] even $300m there isn't shit" and that by the time the IRS took action, "[. . .] hopefully I'm out by then[.]"

59.  According to information provided to the FBI by the Government of Monaco on April 29, 2024, **IZA** stayed at hotels in Monaco on five occasions to include: August 11-14, 2022; September 19-22, 2022; September 22-24, 2022; October 20-27, 2022; and September 19-21, 2023.

60.  In another Telegram message dated February 23, 2022, **IZA** stated "I'm moving to Europe btw[.]"  When asked which country he would move to, IZA responded "Swiz" among other options.

61.  On September 20, 2024, the FBI learned that **IZA** intended to travel from Los Angeles to Zurich, Switzerland, on September 23, 2024.

//

//

//

## V.    CONCLUSION

62.  For all of the reasons described above, there is probable cause to believe that **ADAM IZA** has committed violations of evasion of tax assessments, in violation of 26 U.S.C. § 7201, and conspiracy against rights, in violation of 18 U.S.C. § 241.


Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone on
this 23rd day of September, 2024.

_____
THE HONORABLE KAREN L. STEVENSON
CHIEF UNITED STATES MAGISTRATE JUDGE