1                  UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  UNITED STATES OF AMERICA,    ) Case No. LA CR 24-00630-PA-1
                        )
5           Plaintiff,     )
                        ) Los Angeles, California
6  vs.                     )
                        ) Monday, October 28, 2024
7  ADAM IZA,                )
                        ) (2:42 p.m. to 3:19 p.m.)
8           Defendant.     )
  _____)

9

10                 TRANSCRIPT OF MINUTES OF
         STATUS CONFERENCE RE MEDICAL TREATMENT
11       BEFORE THE HONORABLE A. JOEL RICHLIN
           UNITED STATES MAGISTRATE JUDGE

12

13  Appearances:             See next page.

14  Court Reporter:         Recorded; CourtSmart

15  Courtroom Deputy:      Claudia Garcia-Marquez

16  Transcribed by:        Jordan Keilty
                        Echo Reporting, Inc.
17                     9711 Cactus Street, Suite B
                     Lakeside, California 92040
18                     (858) 453-7590

19

20

21

22

23

24

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

2

1   APPEARANCES:

2   For the Plaintiff:              DANIEL J. O'BRIEN, ESQ.
                                    Office of the United States
3                                       Attorney
                                    312 North Spring Street
4                                   15th Floor
                                    Los Angeles, California 90012
5                                   (213) 894-2468

6   For the Defendant:             JOSEF SADAT, ESQ.
                                    Law Office of Josef Sadat
7                                   9171 Wilshire Boulevard
                                    Suite 500
8                                   Beverly Hills, California
                                        90210
9                                   (310) 988-2627

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  <u>Los Angeles, California; Monday, October 28, 2024 2:42 p.m.</u>

2                          --o0o--

3                     (Call to Order)

4          THE CLERK:  Calling Case 2:24-CR-630, United

5  States of America versus Adam Iza.

6          Counsel, please state your appearances for the

7  record.

8          MR. O'BRIEN:  Good afternoon, your Honor.  Daniel

9  O'Brien appearing on behalf of the United States.

10          THE COURT:  Good afternoon.

11          MR. SADAT:  Joe Sadat for the Defendant, who's

12  present in custody, your Honor.

13          THE COURT:  Good afternoon to you, Mr. Sadat, and

14  to you, Mr. Iza.

15          So, I think we're here really just to sort of

16  check in and make sure that everything is moving along, Mr.

17  Iza, with your medical care.  The Government filed a status

18  report which looked very promising.

19          It looks like, Mr. O'Brien, you reached to Ms.

20  Shen (phonetic) to apprise her of the situation.  She is a

21  supervisory attorney over at the Bureau of Prisons, and it

22  looks like, Mr. Iza, my understanding is you have received a

23  medical screening evaluation and you have already received a

24  referral from the Federal Bureau of Prisons to a specialist

25  for further examination.

4

1        Is that all correct?

2        MR. O'BRIEN:  Yes, your Honor.  Can I just

3 supplement something?  Just before the hearing, I contacted

4 Ms. Shen again just to get a further update.  My

5 understanding is that the referral has not yet been -- well,

6 the referral was made.  No such appointment has been

7 scheduled.  The -- there's a contractor that schedules such

8 appointments called IMS.  I can't remember what it stands

9 for.  And they're at least exploring the possibility of

10 rather than referring him to an orthopedic, but, rather,

11 contacting the doctor who performed the surgery in Nevada to

12 see if that's an option.  I don't -- I can't make any

13 representations as to whether that will indeed happen --

14 happen.  I just know that that's what they're looking at as

15 a possibility.

16        THE COURT:  Okay.  And, you know, just from my

17 perspective, that -- those all seem like reasonable things

18 to consider and explore and -- and what I would hope and

19 expect from the BOP, and just for Mr. Sadat's edification,

20 for whatever it's worth, I've had prior interaction with Ms.

21 Shen and found her to be very responsive and helpful, so was

22 not surprised to see that Mr. O'Brien reached out to her and

23 not surprised that she's been responsive and helpful.  So, I

24 suspect that she'll continue to do that.  So, she's a great

25 contact.

5

1        MR. SADAT:  I -- I've known Ms. Shen for many

2   years, and I actually emailed her I want to say within 48

3   hours from our last court date.  She's on point, doing

4   everything she can to help.

5        Your Honor, I did want to make a -- a full record

6   of everything.

7        THE COURT:  Sure.

8        MR. SADAT:  Can I have at least maybe 5 to 10

9   minutes to do that?

10        THE COURT:  Sure.

11        MR. SADAT:  Okay.  So, just to follow up -- and

12   Mr. O'Brien has gone above and beyond to help with this

13   situation too.  So, that's very much appreciated.  But I

14   just wanted to explain why it's so urgent, number one, and,

15   number two, why it's so important to have that particular

16   doctor.

17        I did forward an email from the doctor that was

18   sent October 16th, and before we get to that, though, I had

19   emailed Ms. Shen, I believe it was on Sunday or Monday after

20   our court date, and I attached all of the medical records,

21   as well as the initial letter from Doctor D. in Vegas.  And,

22   just to refresh the Court's memory, so, Doctor D. made it

23   clear that it was "medically necessary" to take this

24   hardware out, number one.  Number two, that it needed to be

25   done immediately and, number three, that it should be done

6

1  not just with an orthopedic surgeon but someone with that

2  subspecialty of leg lengthening.

3          He then sent a followup email where he said --

4  this is on October 16th:

5              "There are potentially greater

6          medical risks if the surgery is

7          performed by someone who did not perform

8          the initial procedure.  This is

9          especially true given that few surgeons

10         worldwide possess our level experiences

11         with this specific implant and

12         technology.  Factors such as

13         unfamiliarity with the intricacies of

14         the device, nuances of the initial

15         surgical technique, and proper

16         management of post-operative issues

17         could increase the risk of

18         complications, including improper

19         removal, damage to surrounding tissues,

20         infection, or mechanical failure."

21         He then proceeds to confirm that he's available to

22  do the surgery for Mr. Iza and then notes that he works

23  specifically closely with these implants and technologies

24  and that he has at this point implanted and removed more of

25  these specific implants than anyone in the world.  And he

7

1 says that these techniques that he has to mitigate the

2 complications and troubleshoot issues intro-operatively are

3 not strictly followed, they would then lead to those type of

4 risks that we had mentioned before.  And he goes on to -- to

5 end his letter by saying that his unique familiarity with

6 both the implants and the nuances of their removal ensures

7 the best possible outcome for the patient.

8        I then wanted to just -- moving on from that

9 letter, just make some notes that I think are a little bit

10 inconsistent with some of the BOP notes, and these are notes

11 that I had gone ahead and emailed to the Prosecution today,

12 and these are in email format from Mr. Iza to the BOP.  The

13 first incident date of -- that was noted was October 3rd.

14 He says:

15                "Hello.  I need to see someone

16                regarding both my legs extremely

17                urgently.  I have metal rods and screws

18                in both my legs, and with every

19                movement, I can feel them hurting my

20                nerves.  I'm also developing big balls,

21                lumps on both my legs where the rods are

22                in.  I'm beginning to limp on my left

23                leg, and it's concerning me a lot."

24                That was October 3rd.  October 5th:

25                "Hello, I need to see someone

8

1    regarding my legs, please.  I'm in a lot

2    of pain."

3    October 6th:

4        "Hello, I'm sending a reminder that

5    I'm still awaiting the doctor in regards

6    to my legs.  My left leg is starting to

7    become very painful."

8    October 7th:

9        "Following up again in regards to

10    my last request.  I'm having incredible

11    pain in my left leg at night."

12    October 8th:

13        "Hello, I'm following up again on

14    my request for legs.  The pain is

15    increasing daily."

16    October 9th:

17        "Hello, Still writing regarding my

18    legs."

19    October 12th:

20        "Hello, I am following up again

21    regarding my legs.  I'm currently seeing

22    big bumps on my left leg, and it hurts

23    to touch it, and every time it moves

24    when I sit down or stand up.  I still

25    haven't been seen by a medical doctor in

9

```
 1            the last weeks that I've asked to see
 2            one.  Please come and see me as I'm
 3            afraid I'm damaging my legs every day."
 4                "Hello, Follow up once more."
 5            This is October 14th:
 6            "I have not been seen by anyone for
 7            weeks.
 8            And, to take a step back, October 13th:
 9                "Hello, please get to me regarding
10            my last request.  I have trouble
11            sleeping at night due to the pain, and I
12            can feel the bumps in my legs with every
13            movement when I walk.  It's become
14            unbearable.  I've waited for over two
15            weeks now, and I haven't been -- been
16            called to medical or seen by a doctor of
17            any sort."
18            I think I might have said it.  Just to be
19 thorough, October 14th:
20                "Following up once more.  I've not
21            been seen by anyone for weeks."
22            Then we have that appointment, that October 15th
23 appointment which I want to say is largely attributed to
24 this Court and putting it in that order and then obviously
25 the work of Ms. Shen.  Following that, he says:
```

10

1             "Per our conversation regarding the
2        rods, metals and screws in my legs, I'm
3        writing to let you know that my left leg
4        is starting to lose some range of motion
5        in terms of it bending going up and down
6        in my bed.  Please advise on what to do
7        as it's become exhausting to do my day-
8        to-day activities such as cleaning,
9        walking and sitting for long periods of
10       time."
11       October 18th:
12            "Hello, I'm requesting any sort of
13       follow up of any kind in regards to my
14       legs.  It's become an unlivable
15       condition.  I'm not able to move around
16       without pain anymore.  Please let me
17       know any updates urgently and
18       desperately.  Thank you."
19       October 19th, just "Hello" and two question marks.
20  October 20th:
21            "I discovered -- hello, I've
22       discovered more bumps growing on the
23       back of my left leg this morning."
24       October 21st:
25            "Hello, I am losing my mobility in

1        my left leg, and there is bumps growing

2        on my right leg that is starting to hurt

3        as I walk.  I asked the doctor for a

4        cane or a walker to help me to not put

5        too much pressure on my left leg as it's

6        already hurting too much, and they

7        simply say they have nothing for me.

8        The pain is growing by the day, and I

9        feel that nothing is being done to help

10       me."

11       October 23rd:

12            "Hello, I'm writing to note to the

13       doctor that I'm having random pain where

14       I don't feel certain places in my upper

15       leg, and I feel as if my nerves are

16       stopping to function, which during that

17       time I'm forced to use the cane.  I've

18       experienced this multiple times this

19       week.  I'm extremely worried that at

20       some point I may have nerve damage in my

21       entire leg and may not be able to move

22       it for long periods of time.  What can I

23       possibly do to prevent this?  I've been

24       taking the meds prescribed."

25       So, your Honor, based on that, I was going to ask

1 for the following:

2       If we can, in fact, get him to his surgeon

3 immediately, great.  But, if not, I was going to ask for a

4 followup status conference to see where we're at with things

5 and then at that point move under Subsection (I) as a

6 medical necessity.

7       THE COURT:  Okay.  So -- so, a couple of things.

8 First, just -- just to confirm, it -- what I was -- it

9 sounds like Mr. Iza has been prescribed pain medication?

10 Because I heard a lot of complaints about pain, and then I

11 heard a reference to taking the pain medication but has Mr.

12 Iza received pain medication?

13       MR. SADAT:  Yes, your Honor, but the type of pain

14 medication they prescribed is nothing to -- significant.

15 It's Tylenol, basically Extra Strength Tylenol if I'm not

16 mistaken.

17       THE COURT:  Um-hmm.

18       MR. SADAT:  I believe that's in the notes, in the

19 medical notes.

20       THE COURT:  Okay.  And -- and I see that he does

21 have a cane.  Has he been prescribed -- has he been provided

22 with some device to assist with walking and take the

23 pressure off his legs?

24       MR. SADAT:  He's asked for that.  It looks like

25 they have finally been able to accommodate him recently.

1          The issue that we're having, your Honor, is

2    because it's medically necessary to remove this from his

3    body ASAP, we essentially have a -- a ticking time bomb in

4    his legs.  It can go off at any minute.  He can permanently

5    become a crippled.  And normally you would say, Well, maybe

6    that -- that comment is a bit exaggerated, but it's

7    coinciding with these lumps becoming increasingly bigger on

8    his legs.  I know that our investigator, Mr. Romero, was

9    able to get in contact with another doctor who specializes

10   in this, and while the first doctor in Vegas did not say one

11   way or another that these lumps were necessary consistent

12   with the surgery, this other doctor indicated that these

13   lumps were, in fact, indicative of it and that we needed to

14   act urgently.

15          I would just also point out, your Honor, that this

16   is a situation where -- and -- and, by the way, his family

17   is here all again, his father, his mother, his close friend

18   here in Orange County, and other relatives here.

19          THE COURT:  Welcome.

20          MR. MOHAMED:  (Indiscernible.)

21          MR. SADAT:  Sure.  Is it okay if he takes two

22   minutes, your Honor, to address the Court briefly?

23          THE COURT:  Sure.

24          MR. SADAT:  Come on up.

25          MR. MOHAMED:  Hi.  I'm Asad Mohamed (phonetic).

14

1  I'm  Adam's father.  So, this second time I come in with my
2  son for this hearing.  Just I want to tell you something.
3  We left my country 2005.  This time Adam is five years old.
4  I stay to Syria six years because this time is my country
5  revolt.  I stay in Syria six years.  This time Adam 11 years
6  old.  I come to United States.  Adam go to school, go
7  through high school.  Adam forgot Arabic, speak Arabic.
8  Adam American 1,000 percent.  He have citizen American.  We
9  have citizen American, wife, children.  I have three girls
10  born here.  I'm good family.  Adam have good friends.  I
11  told the Probation -- Mr. Probation called me, called my
12  family.  Mr. Probation told me, You can do anything for your
13  son?  I told him, Yeah, sure.  He say, You can sign?  I told
14  him, Yeah, sure, me sign, wife sign, my daughter sign.  I
15  have my -- another son who's 21 sign.  I have two property
16  in St. Louis, Missouri.  I told him I sign for this
17  property.  Now, Mr. -- sorry.  Now, Adam, he have
18  professional surgery.  Adam needs help.  You know, Adam
19  needs somebody get him to bathroom, somebody clean, somebody
20  eating.  I live in Missouri.  Adam live in L.A.
21          Now I promise, me and my wife and my family live
22  with Adam here.  Okay.  I sign everything for Adam.  You can
23  have him GPS, okay.  You can go to doctor, hospital, do
24  surgery.  I promise 100 percent Adam show up to court.  Adam
25  not have family in Iraq.  All my family is passed -- passed

15

1  away.  My dad passed away.  My mom passed away.  I have
2  three brothers passed away because war in Iraq this time,
3  2005.  Now Adam not have any family in Iraq, not speak very
4  well Arabic.  Adam love United States.  Adam live in United
5  States.  Now I told you again I promise 100 percent I -- me
6  and my family live with Adam in L.A.  Adam no technology, no
7  phone, no go anywhere, just go hospital, go doctor, go
8  shopping with me.  I help get Adam out now because Adam do
9  not have chair.  Okay.  Adam need help this time.
10         Just I told you help my -- help family for Adam.
11  But at least because I told you, a friend for Adam, wife,
12  friends for Adam.  Everything good.  I have paper for
13  doctor.  I have -- I have paper for (indiscernible).  Adam
14  not come into contact (indiscernible) out.  Okay.  But this
15  time Adam work with you with case, okay, show every time --
16  every time, but, please, this time Adam need help because
17  Adam is medical (indiscernible), need surgery, need -- thank
18  you, sir.
19         THE COURT:  Okay.
20         UNIDENTIFIED SPEAKER:  I'm working and --
21         THE COURT:  So, hold -- so, hold on.
22         UNIDENTIFIED SPEAKER:  (Indiscernible.)
23         THE COURT:  So, hold on.  Only one at a time.
24  I'm --
25         MR. SADAT:  Ms. (indiscernible), you can come on

16

1  up.

2           UNIDENTIFIED SPEAKER:  I'm working --

3           MR. SADAT:  Come here.

4           UNIDENTIFIED SPEAKER:  (Indiscernible.)

5           THE COURT:  Okay.

6           UNIDENTIFIED SPEAKER:  (Indiscernible.)

7           THE COURT:  Hold -- hold on.

8           UNIDENTIFIED SPEAKER:  (Indiscernible.)

9           THE COURT:  So --

10          UNIDENTIFIED SPEAKER:  (Indiscernible) -- it's not

11 enough.  He need to see the doctor, please.

12          THE COURT:  Are you Mr. Iza's mother?

13          UNIDENTIFIED SPEAKER:  No.  His mother.

14          THE COURT:  You're --

15          UNIDENTIFIED SPEAKER:  My husband, we came, my

16 husband and my kids.

17          THE COURT:  I see.

18          UNIDENTIFIED SPEAKER:  Eight years old.

19          THE COURT:  And you're --

20          UNIDENTIFIED SPEAKER:  For him.

21          THE COURT:  -- a family friend or cousin?

22          UNIDENTIFIED SPEAKER:  We are very close family.

23          THE COURT:  Oh, you're the family.

24          UNIDENTIFIED SPEAKER:  My husband is more family

25 for (indiscernible)

17

```
 1          THE COURT:  So, here's --
 2          UNIDENTIFIED SPEAKER:  I know him -- I know him 20
 3  years.  We went to his house and everything.  He's a good
 4  boy.
 5          THE COURT:  So, here -- so, here -- so, here's
 6  where we are in terms -- in terms of big picture, and I know
 7  it's -- I -- first of all, I appreciate you attending.
 8          UNIDENTIFIED SPEAKER:  Tylenol isn't -- it's not
 9  enough.  Please.  The Tylenol, you go to the medicine, they
10  give you Tylenol.  Doctor, they give you Tylenol.  They need
11  more exam, more checking --
12          THE COURT:  Right.
13          UNIDENTIFIED SPEAKER:  -- him, please.
14          THE COURT:  Understood.  Look, there's -- the
15  reason the Bureau of Prisons only gives out Tylenol is
16  because of preventing --
17          UNIDENTIFIED SPEAKER:  My husband --
18          THE COURT:  -- substance abuse --
19          UNIDENTIFIED SPEAKER:  -- he just have surgery
20  that --
21          THE COURT:  Understood.
22          UNIDENTIFIED SPEAKER:  -- he have a stroke --
23          THE COURT:  And, again --
24          UNIDENTIFIED SPEAKER:  (Indiscernible) they give
25  you Tylenol, Tylenol, Tylenol --
```

18

1            THE COURT:  And I --

2            UNIDENTIFIED SPEAKER:  (Indiscernible.)

3            THE COURT:  And I -- and I appreciate you coming

4  in.  As I -- as I said last time, I think it says a lot

5  about Mr. Iza that so many of you support -- but hold on a

6  minute.  If I'm going to let you talk, let me just sort of

7  remind you where we are, which is I've ordered Mr. Iza

8  detained pending trial because I found that there were no

9  conditions or combination of conditions that could

10 reasonably assure his -- his future appearance and/or the

11 safety of the community.  You know, if you -- one of the

12 important facts was that Mr. Iza was arrested about to board

13 a flight to I think it was Switzerland with a one-way

14 ticket.  There's a lot of reasons to -- am I factually

15 mistaken?

16           MR. SADAT:  Your Honor, if you recall, the flight

17 was a romantic flight with his girlfriend that was canceled.

18           THE COURT:  Okay.  I --

19           MR. SADAT:  So, he didn't end up going and wasn't

20 planning on going.

21           THE COURT:  I -- I recall your -- your -- your

22 take on things, understood.  But -- but I -- I set forth --

23 I set forth my reasons at the last hearing.  I stand by

24 that.  What I also said very clearly is I want to make sure

25 that Mr. Iza gets appropriate medical attention.

1        Recall that Mr. Iza I believe was supposed to get

2   this procedure done over a year ago, and he chose not to for

3   whatever reason, and I understand why now he absolutely

4   wants to get it done, but he is in federal custody at the

5   moment, and what I can do is to try to make sure that he

6   gets appropriate medical attention in federal custody.  He's

7   received the medical screening evaluation.  He's received a

8   referral to a specialist, and the IMS -- maybe that's the

9   Inmate Medical System.  I'm not sure what it stands for, but

10  the Federal Bureau of Prisons is working through the

11  appropriate process to find an appropriate specialist.  They

12  have been moving quickly in the scheme of things.  It's

13  been, what, two weeks since the last time we chatted.

14        So, I'm glad, Mr. Sadat, that you're in -- in

15  contact with Ms. Shen.  At this point, I think the best

16  thing to do is for you to keep following up with her and

17  figure out -- say, Hey, what's the timeline for the IMS

18  service to determine an appropriate referral to a

19  specialist?  Sounds like they're considering a number of

20  options which seem reasonable.  At this point, I would say

21  let's -- let's see how that goes.  I'm happy to set another

22  check-in in a week or two weeks, whatever you think is

23  appropriate, and let's see where they are, and let's make

24  sure that the BOP keeps moving forward.  At this point, I

25  haven't seen any evidence that the BOP is incapable or

20

1 unwilling in providing the specialty care that Mr. Iza wants

2 and needs.  They have demonstrated to the contrary, that

3 they are willing and making appropriate efforts to do that.

4        So, my goal is to keep moving things forward to

5 make sure he gets appropriate medical attention.  He does

6 not at this point need to be released in order to get that

7 medical attention.  If it appears that the BOP is unwilling

8 or unable to provide the appropriate medical are, then I may

9 reconsider that decision.  At this point, I see evidence

10 that they are willing and they are making efforts to provide

11 appropriate medical care.

12        So, that's where we are.  That's only my decision.

13 Mr. Sadat has already sought review from another judge, as

14 Mr. Iza is entitled to do.  And, so, another judge may feel

15 differently, but that's where I am.  And -- and I'm fine if

16 you want to come forward and you want to say something

17 briefly.  That would be fine.  Just one at a time.  Okay.

18    (Pause.)

19        AHMED:  My name is Ahmed (phonetic), a friend to

20 Adam almost like seven years.

21        THE COURT:  Um-hmm.

22        AHMED:  I want to tell you something about I have

23 issues with medical here in United States.  I have got

24 accident from three years ago.  I make six surgery.  For --

25 for system, for -- for healthcare here, I should be see a

1 doctor for -- after three days.  (Indiscernible)  I see the

2 doctor appointment after one year, two months because I take

3 medication -- medication wrong for one year, two months for

4 working for the system for medical he give me for

5 neurosurgery doctor.  For this reason I worry about Adam.

6 He can have infection for leg, and the system here will be

7 so slow, but I don't know why you're looking for

8 (indiscernible) Adam for -- about his health after you kind

9 of bring private doctor for him, thinking about his health.

10          And, another thing, for any (indiscernible) of

11 paper for anything I can sign for him.  I can sign anything

12 for him because he -- he good man, but if he were to use the

13 system, he can -- he have infection in his leg.  He have

14 something immediate in the leg, but here the system so slow.

15 Tylenol not help.

16          THE COURT:  Okay.  So, I think -- I think I

17 understood you -- you offering to provide a surety, and I

18 heard your concerns about the speed of being able to get him

19 treatment.  So, my goal is to keep that  moving quickly.

20 Right now it is moving along.  So, we -- we do have to give

21 the BOP an opportunity to determine the best specialist

22 referral.  They've already given them a referral, and, so,

23 let's -- let's give them an opportunity to do that.

24          AHMED:  It's not -- not like a specific doctor

25 make decision.  I -- I telling you I have issues.  I have --

22

1 I see first doctor my heart.  He sent for me this normal

2 doctor make it for me.  I make a two surgery because he send

3 it for me as specialty for doctor.  For -- four the -- the

4 court, he can let him long.  There's no specialist.

5              MR. SADAT:  Just his mom to say something briefly.

6              THE COURT:  Sure.

7              UNIDENTIFIED SPEAKER:  (Indiscernible.)

8              THE COURT:  Sure.

9              UNIDENTIFIED SPEAKER:  Just I want talk to Court.

10 Just I need me stay here, he go out, please, because this is

11 very important.  He need surgery.  This is danger for him.

12 If you take long time here, he have death, he have many

13 things.  Believe me -- believe me, if you go (indiscernible)

14 I -- I -- put me too in GPS, anything you want.  Just we

15 need go out.  Please, because he need -- please.

16              THE COURT:  I -- I'm sorry that I can't, that I

17 can't offer you something more satisfying of what you want

18 to do, but --

19              UNIDENTIFIED SPEAKER:  I (indiscernible) you want.

20 We do any -- anything you want.

21              THE COURT:  -- but we will -- but we will keep --

22              UNIDENTIFIED SPEAKER:  We do it.

23              THE COURT:  -- but we will keep on the efforts to

24 make sure that he gets an appropriate specialist referral so

25 that --

1          UNIDENTIFIED SPEAKER:  This is surgery -- this is

2  not easy.

3          MR. SADAT:  So, your Honor --

4          THE COURT:  Understood.

5          MR. SADAT:  -- first of all, I appreciate your

6  patience in hearing everybody.  I think we're all actually

7  saying the same thing.  We're just looking at it a bit

8  differently.

9          So, you've said some very important things.  You

10  said that you wanted to make sure things were moving

11  quickly.

12          THE COURT:  Um-hmm.

13          MR. SADAT:  And, from your perspective, it has

14  been moving quickly.  From the family's perspective, every

15  day that goes past, they're concerned that their son is

16  going to be permanently crippled.

17          THE COURT:  Um-hmm.

18          MR. SADAT:  I -- I would hope that there's a way

19  to compromise that.  I don't think there is from their

20  perspective, right?  And perhaps if -- if this was our loved

21  one too, we might have a different vantage point of it as

22  well.  With that said, I would ask if the Court is not

23  inclined to find that it is medically necessary to release

24  him today to get the surgery, I would ask for as quick as

25  possible a date that we can come back where your Honor would

24

1  feel that if BOP did not act by that date, you would

2  determine it to be not quick enough.

3          THE COURT:  Well, why don't we do this?  My

4  suggestion is that you reach out to Ms. Shen and see if she

5  can get any estimate on the referral decision.  I'd like to

6  -- I'd like to see what IMS wants to do.  That's -- that's

7  the right process.  Again, from -- from Mr. O'Brien's

8  representation about what they're doing is they're

9  evaluating who is an appropriate specialist who can provide

10 appropriate evaluation of Mr. Iza's needs.  That's exactly

11 what should be happening.  So, I'm glad that is happening.

12 We need them to make a decision.  So, let's -- let's see

13 what we can do there.

14          I would reach out to her.  Let's see what she

15 says, and maybe one or both of you can file an updated -- it

16 doesn't -- I don't have a preference.  It can be a joint

17 update, whoever it's easier.  Somebody file an update and

18 let us know just as soon as you have answer, whether that's

19 tomorrow or in a week.  You know, hopefully, let's try to

20 get it within a week, try to get some reasonable response

21 time and, so, hopefully she can say like either here's the

22 decision or, I'll have the decision by this date.  You know,

23 I also -- I understand people don't want to sit around

24 indefinitely.  We want to have some sort of, Hey, we're

25 working towards something.  So, let's -- let's see if we

25

1  can't get some guidance within seven days of, Okay, we
2  either have a decision or we're going to make a decision.
3  Let's -- again, you got -- we have to -- we have to try to
4  be reasonable with -- with the BOP process but hold their
5  feet to the fire and keep moving things forward.  And,
6  again, I -- so far they're being responsive, which is a good
7  thing, and, you know, so, I -- I don't see anything from
8  them saying that they can't or won't provide the care that's
9  needed.
10          MR. SADAT:  That was the other thing that you had
11  mentioned that I thought was significant.  You said that you
12  want it to be moved quickly and also that if you found out
13  that the BOP was not willing and/or was incapable, then you
14  would be inclined to release him temporarily for --
15          THE COURT:  Then I would --
16          MR. SADAT:  -- the medical procedure.
17          THE COURT:  Then I would reconsider.  I'm not --
18  you know, I'll have to -- I'm not going to prejudge that
19  decision.
20          MR. SADAT:  And I don't -- I don't think the issue
21  is that they're not willing.  I think clearly their efforts
22  indicate that they're willing to do this.  The issue that I
23  have brought up from the beginning and what the family is
24  expressing is that they are incapable of doing it unless it
25  gets specifically assigned to this doctor and done

26

1  immediately.

2          Now, Mr. O'Brien has given me some hope that that

3  can be done, and hopefully that -- that comes to fruition.

4  But if it does not within a week, your Honor, I would just

5  ask that you really take this to heart because, for what he

6  is being accused of, I understand that it's serious.  But at

7  the same time, it's not worth having somebody -- a 24-year-

8  old kid end up crippled for the rest of his life.

9          THE COURT:  Of course not.

10          Anything else, Mr. O'Brien?

11          MR. O'BRIEN:  A couple of things, your Honor.

12  First of all, I wanted to indicate to the Court that the

13  Defendant filed an appeal of the detention order, and the

14  parties have been instructed to file a joint statement

15  tomorrow.  There has not yet been a hearing scheduled for

16  the detention appeal.

17          THE COURT:  Right.

18          MR. O'BRIEN:  And, so, I want to make sure that

19  things are proceeding in a linear fashion.  And then --

20          THE COURT:  And -- and it's also a little -- I

21  think things got a little confused.  So, I signed the order

22  releasing the transcript for use in the appeal.  I do think

23  the Court got a little confused in terms of you initially

24  got assigned a duty judge, but now there is a District

25  Judge.  So, I'll leave that to you to figure out who's the

27

1 right judge.  It's a little unclear to me at this point.  It
2 seems like it -- I'll leave that to you.
3         MR. O'BRIEN:  I think it will be going to the
4 assigned judge, but I've asked for clarification of the two
5 court reporters -- sorry -- court clerks.
6         I also think that there's a little bit disconnect
7 as to what medical information the Defendant was presenting
8 to the Court and what they've provided to the Government,
9 and I'd like the Defense to provide the Government with the
10 documents he referenced in his arguments today.  I did
11 receive the series of emails in which the Defendant made his
12 own subjective statements as to his --
13         THE COURT:  Um-hmm.
14         MR. O'BRIEN:  -- condition.  I have not received a
15 document in which the doctor in Nevada said that he's in a
16 unique position to provide the surgery and that he's the
17 number one expert in the field, nor have I received a report
18 that a local doctor has determined that the lumps are
19 consistent with the medical implants.  So, I'd like the
20 Defense to provide me with those documents as well.
21         THE COURT:  Any issue with that, Mr. Sadat?
22         MR. SADAT:  Your Honor, I am almost 100 percent
23 sure that I -- I have provided that followup letter from
24 Doctor D. to Mr. O'Brien, and I'm just scrolling through my
25 emails right now.

28

1          THE COURT:  Okay.  But, if not, you'll -- you're
2    happy to provide it I assume?
3          MR. SADAT:  Absolutely.  Yes, absolutely.
4          Your Honor, can we --
5          THE COURT:  I mean, I'm not -- yeah, just for --
6    for purposes of the record, I'm not sure how a local doctor
7    can make any kind of clinical finding about Mr. Iza who is
8    in custody.  So, you know, I don't really know how to give
9    that any weight.  But --
10          MR. SADAT:  We had provided the doctor with just
11   photographs, this local one, I think Doctor -- what was the
12   name of the gentleman?
13          MR. ROMERO:  (Indiscernible.)
14          MR. SADAT:  Yes.
15          MR. ROMERO:  (Indiscernible.)
16          MR. SADAT:  Is it okay if he talks, your Honor,
17   just briefly as the Court -- go ahead and come on up.
18          MR. ROMERO:  Good afternoon, your Honor.  My name
19   is Armani Romero.  I'm a private investigator working for
20   the defense of Mr. Iza.
21          THE COURT:  Good afternoon.
22          MR. ROMERO:  So, I believe Mr. Sadat made
23   reference -- or is referring to an ongoing exchange of
24   emails.  There's a Doctor -- forgive me -- H-R-A-Y-R, Hrayr
25   Bosmajian (phonetic).  He's in Pomona, and he is one of a

29

1  few doctors that specialize in this sort of subspecialty,

2  and he's emailed me yesterday -- he emailed me yesterday at

3  7:59 p.m., and if the Court will allow me, I'll -- I'll read

4  what he said, if that's okay.

5          THE COURT:  You can -- you can just provide it

6  written --

7          MR. ROMERO:  Okay.

8          THE COURT:  -- written down.  It's just -- again,

9  he hasn't -- it's -- it's helpful.  You can provide it to

10 Ms. Shen and the BOP, but, you know, I'm not sure I'm

11 qualified to do anything with it.  He -- the doctor hasn't

12 examined Mr. Iza.

13         What the IMS will do, what -- what it is their

14 function to do and what is their expertise to do is to -- to

15 do this, is to identify an appropriate medical professional

16 to provide the care that Mr. Iza needs.  So, that's the

17 process I'm focused on.  That's who -- that's -- that's the

18 process that I think should take place, and -- and it may be

19 that they agree that -- with the physicians that you would

20 like, but it is their role to identify an appropriate

21 physician.  And, so, let's see -- let's see what their

22 determination is.  And, obviously, these things could be

23 helpful to them.  So, thank you for that.  You can -- you

24 can provide it to Ms. Shen.  Mr. Sadat can do that.

25         MR. ROMERO:  Thank you.

30

1          THE COURT:  Anything else from the parties?

2          MR. SADAT:  Your Honor, in terms of a status

3  conference, I was going to ask to come back exactly one week

4  from today.

5          THE COURT:  Let's do this.  Let's get -- let's get

6  a status report just filed.  You know, let's see what it

7  says, and then -- and then let me set one after that.  I --

8  if -- if we get a response before seven days, then great.

9  We can take action even sooner than that.  But let's --

10  let's -- I want to be able to evaluate what the answer is

11  and then -- and then you can make a request in the status

12  report of what you think's appropriate, and -- and, as you

13  know, I can -- I can set a status conference the next day.

14  I'm -- I'm very flexible.  So, but let's -- I don't want to

15  waste everybody's time.  Let's make sure we can keep things

16  moving, and let's see what the answer is on this first

17  question.

18          The question is either can you give us an answer

19  or when can we have a determination from IMS on an

20  appropriate specialty referral for Mr. Iza.  That's the

21  goal.

22          MR. SADAT:  And, your Honor, when you say

23  appropriate specialty referral, you mean, when the actual

24  surgery would take place or are you talking about when the

25  consultation would take place?

1        THE COURT:  He needs to have a consultation first,

2   right.  I mean, he has been seen by -- a general medicine

3   practitioner I assume has referred him to a specialist.  The

4   IMS service is determining -- is trying to identify an

5   appropriate specialist.  He needs to now be seen by a

6   specialist.  Yes, that will be a consultation.  It may be

7   video for all I know, but that's step one.  You -- before

8   you get scheduled for surgery, you need to have a

9   consultation.

10       MR. SADAT:  I'm just anticipating this, and I'd be

11  shocked if it doesn't end up being this way.  The

12  consultation that they're going to have him with is going to

13  be an orthopedic surgeon, but it's not going to be someone

14  with a subspecialty of leg lengthening.

15       THE COURT:  Well, let's see.

16       MR. SADAT:  So, if that is the case, we would

17  obviously let you know that right away.  But I would just

18  ask this, because when you put that order in last time, it

19  really helped get things moving with Ms. Shen.  If you could

20  just put some kind of minute to that effect so that when I

21  reach out to her and try to get an answer to that, I can try

22  to get it right away.

23       THE COURT:  Sure.  Let me -- I'll -- I'll think

24  about -- I'll issue something.  As you know, Ms. -- I don't

25  have jurisdiction over Ms. Shen.  So, I can't really order

1 her to do things, but -- but, yes, I will issue a minute

2 order, and you're welcome to use it, and hopefully it will

3 be helpful.  Again, based on your own experience and mine,

4 she is a consummate professional who is responsive, and you

5 shouldn't need my order, but I'm happy to give it to you.

6          Okay.  Anything else?

7          MR. O'BRIEN:  Nothing further from the Government,

8 your Honor.

9          THE COURT:  Okay.  Well, thank you to the family

10 for coming in.  I understand how upsetting this is for you,

11 you know.  So, I appreciate your being here.  Again, I'm --

12 I'm sorry I can't give you what you want today.  What I'm

13 going to do is try to make sure that your son receives the

14 appropriate medical attention.  That's really what I can do

15 and what I'll focus on.

16          THE CLERK:  This court is now adjourned.

17     (Proceedings adjourned.)

18

19

20

21

22

23

24

25

33

1        I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5    /s/Jordan Keilty                    11/1/2024
     Transcriber                         Date

6
     FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

7

8
     /s/L.L. Francisco
9    L.L. Francisco, President
     Echo Reporting, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25